and I'm not sure I'm pronouncing it right, Lugiai or Lugay. May it please the court, Kevin Tate appears on behalf of appellant Michael Lugiai. Lugiai, okay. I'd like to move right into what I believe is the central issues here. First, I'm asking, Mr. Lugiai is asking this court to reverse and remand to the district court their ruling on two issues. One, an issue regarding a Fourth Amendment violation, and secondly, a sentencing issue dealing with improper obstruction of justice enhancement. I want to begin with the Fourth Amendment issue. It clearly was an involuntary consent. That issue was raised in the district court. The issue was that the consent of Mr. Lugiai's wife was the product of an unconstitutional premises freeze. Their agents with the U.S. Marshals Service froze their premises, and our contention is that it was without probable cause. There would have been no consent to enter the house but for that premises freeze. There was no probable cause as I distinguished the case from MacArthur in the district court. The court relied on a holding in MacArthur v. Illinois saying that generally a premises freeze is per se unreasonable and a constitutional violation. But in certain limited circumstances, it can be allowed when there is probable cause. She, again, relied on a holding in MacArthur v. Illinois. This case is distinguishable in almost every point from that case. Mr. Tate, can I ask you on the standard of review here, as I understand it, there was a full evidentiary hearing on your motion to suppress. Yes. So we are dealing, I take it, with mixed questions of law and fact. We've got factual findings by the district court that the consent was knowingly and voluntarily given. But you're arguing that we should review de novo the application of MacArthur to the facts as found by the district court? Yes, Your Honor. Okay. So you're not challenging on clearly erroneous grounds the factual findings of the district court? Challenging and unclearly erroneous as well is that the factual findings were not supported by the facts, by the record in the case. In particular, MacArthur, in that case, there was firsthand information that there was drugs in the house. Police were summoned to the scene. In this case, there was no firsthand information from any source that there was any contraband, anything illegal was afoot at the Lou Jai residence. What do we do with the district court's observation that there were statements attributed to his coworkers at the Art Institute who overheard him say that he had police uniforms and equipment and so on? The record is devoid of any reference to that whatsoever. That is a clearly erroneous factual conclusion. So the district court just made that up and it's factual? Well, I don't want to use the term made up, but it's not in the record. It's not in the record at all. What is in the record? Didn't the deputy marshals testify that that's what they were told? No, they never testified that they were told that there was a marshal's uniform in the home or that there was guns in the home. What Deputy Diliberti and Deputy Hall both testified to is that they were told that he bragged about being a U.S. marshal, that he had talked about purchasing firearms over the Internet at work, but there was no nexus whatsoever between that and anything being in his home. Okay. So let me try to understand your factual argument. You are acknowledging that the witnesses did tell the marshals about conversations they had in which he mentioned firearms and police equipment, but your factual challenge goes to the nexus to the house? No. I dispute the fact. We dispute as well that there was any conversations or that there's any entry in the record where any witness is testifying that Mr. Lugi talked about police equipment being in his home or purchasing police equipment. Then I really am confused because you just said he acknowledged that he talked about firearms. Firearms being purchased over the Internet. That's what the testimony was. Okay. So if the district court credited that admission, why would it be improper to authorize the issuance of a search warrant for his house to look for those weapons? Because there was no testimony regarding what timeframe they were talking about, whether it was this year, last year. It was a very vague testimony. There was no concrete evidence at all that the court could rely on the issue of search warrant. They had some general conversation of that, oh, I'm going to look on the Internet for some firearms. There was no testimony, for instance, that he actually purchased any firearms, that he acknowledged purchasing firearms. Let me ask you this. At the time the police are acting and setting in motion their request for a warrant, which, of course, ends up being short-circuited as events play out, did they know that he had a prior felony conviction and, therefore, that the possession of firearms was illegal? I believe that the record is clear that that was discovered after the fact. So as far as they know at the time they are acting, he may well have had firearms, but they had no knowledge to let them know that the possession of those firearms was illegal? Is that the argument? Correct. And their argument is also that they didn't have any reliable information that he even possessed or had any firearms at that point. It was just a general conversation. It is unattributed to any particular employee in general, but they say we talked to an employee. They said he also looked on the Internet from time to time for firearms, not that he purchased one, not that he said he purchased one, not that he said he had some shipped to his house, not that they ever saw him with a firearm. It's very clear that they never saw him in possession of any contraband. No one had ever been in the home. He never said he had contraband at his home, and there was no testimony to that effect. What do we do with the admission by the wife when the deputy says, are there any weapons in the house? And she says, yeah, there are two guns inside. That's after the fact. That's after the premises freeze. But for this unconstitutional premises freeze, he never would have got to that point. But are you also arguing that the deputies did not have probable cause to look for the identification or the means by which she might? No, I'm not arguing that at all. I'm only arguing that they didn't have probable cause to, excuse me. Wouldn't that have authorized a search warrant to look for items related to the impersonation of a Federal officer at the house? No. No, because this investigation really was about the possession of a crude replica badge that at the point that they're freezing this premises. Credentials, right? Not just a badge, but also credentials. It's a credential badge. It's really just a credential, not even a badge. I guess my question is, why is it then, why is there not probable cause to support the issuance of a warrant to go into the house to see what he's using to manufacture, create, or procure these items that he is trying to use to pass himself off as a deputy U.S. Marshal? Maybe there could be probable cause, but the issue is this. But there doesn't have to be probable cause to search for the weapons. That's the question I'm wrestling with, Mr. Tate. Just because they found guns doesn't mean that they didn't have probable cause to support the issuance of a warrant for other incriminating evidence at the house. And if they had probable cause to get a warrant, then isn't the district court correct in finding that the wife could consent in lieu of making the officers get a warrant? No, because there was no probable cause to search the house. There would have to be some nexus between facts known to the officers at that time. Well, they clearly knew he'd been impersonating or attempting to impersonate a Federal officer, did they not? They knew that, and they also had the credentials at that point as well. So why, with nothing more at that point, why wouldn't that be sufficient to establish probable cause to enter the home to look for other instrumentalities of that crime? In fact, it's one issue. But the issue really is an issue before. But that is the issue under the Fourth Amendment, Mr. Tate. It's the question of did they have probable cause to obtain a warrant to enter the house. And I think the answer is yes, isn't it? No. The answer is not yes. And the issue before this Court is whether or not there's probable cause to freeze that premises and then use that as a battering ram to get consent. Now, is the standard of probable cause to freeze the premises the same as probable cause to obtain a warrant to search the premises? Yes. I'd like to reserve one minute for rebuttal, if I may. Sure. May it please the Court. Darren LaHood on behalf of the United States. It's the government's position in this case that there was a direct nexus between the facts learned by the Deputy U.S. Marshals and the home where the defendant resided at. And what's that? I'm sorry. What's the nexus? Your Honor, the nexus is these Deputy Marshals that responded to the Art Institute on that day had information that this person was employed at the Art Institute, had been impersonating a Deputy U.S. Marshal, that that badge, credentials, and also identification had been shown to different employees there at the Art Institute. In addition, Your Honor, there was information put forth that was learned by the Deputy U.S. Marshals that he had weapons, that he had uniforms, that he had police paraphernalia. Following up on that, it's in the record that the defendant, when he was asked to talk and inquire of him about this particular badge, he fled the scene for approximately ten minutes and was eventually found. When the Deputy Marshals initially left the Art Institute, they had not found the badge. They had not learned any information from the defendant. Again, he was not forthcoming in any respect. In addition, he interviewed him. Can I interrupt for just a minute? Yes. I think I hear an implication, but I want to clear up whether it's a permissible one or not. At the time they froze the premises, had the telephone call been made back to the police from the Art Institute that said that the badge and credential had been found? I think the record reflects, Your Honor, that the Marshals were on the way to the premises and had not the badge not been recovered at that point, Your Honor. No, I'm asking a different question. At the time they froze the premises, had the badge been found and had the police been alerted that it had been found? Yes, Your Honor. I believe the record is clear on that. So at the time they froze the premises, they were not looking for the badge and the credential that he had mentioned and had there at the Art Institute because that had been found? I believe that's correct, Your Honor. Okay. Let me ask a different question. I think I'm hearing a different story from the two of you as to what he said as to the existence of uniforms. I think I heard from Mr. Tate that he never mentioned uniforms, and I know I just heard from you that he did mention uniforms. Can you point me quickly to someplace on the record where we know that he mentioned or there's testimony that he mentioned uniforms?  Your Honor, I'm looking at page 29 and 30 of the record. No, I'm in excerpts of record volume 1 or 2. I'm looking at excerpts of record volume 1, page 30, Your Honor. And in there, Your Honor, it talks about line 11. We learned that the defendant had an ID, had shown a badge to other employees at the Art Institute, identification, and he identified himself as a part-time marshal. Yes. In addition to line 18, we found that he had a DDD-214 and stated false information as he was employed in the armed services as a special forces operator. Yes. And on page 31, he stated that he thought he might have a counterfeit U.S. badge and identification, and they thought it could be found in the building. Yes. In addition, skipping to page 32, line 22, it said Mr. Lujan had a counterfeit badge, counterfeit identification, had been arrested before for impersonating a police officer, had been seen with a counterfeit badge, and that there was other material that may be at his house pursuant to that. Now, okay, let me look at that. Your Honor, that information ---- Oh, now, that's when he's talking to the U.S. Attorney's Office. And that's information from one of the U.S. marshals. Back that we received, had a counterfeit badge, identification, previously arrested, other employees have seen him with a counterfeit. I'm still waiting to discover uniforms. Okay. Here we get attire. Okay. And when you say you found out the defendant prior felony was at Chicago, and was that for performing a police officer, yes. And in that case, did he have a loaded firearm then? Yes. And other police attire. But that's with the previous conviction. I'm still waiting to find out if the police knew, or something in the record, that tells me at the time the police froze the premises in this case, not the earlier Chicago case, that they'd heard that he had police uniforms. And I've not been pointed to it yet. Your Honor, that specific phraseology, that he had uniforms at the house. Although he had uniforms, period. I'm still waiting for you to point that out to me. Your Honor, that specific language is not located in the record. So, in other words, we have nothing to rely on to say that the police knew or had heard that he had police uniforms at the time they froze the premises? They had conversations with co-employees and employees that he had worked with there regarding his behavior, and specifically that he had been talking as an assistant U.S. marshal, had shown a badge, had talked about weapons, all of that information, Your Honor. And when they went to ask him and talked to him about that, they couldn't find him anywhere. He had fled the scene. Let me come back to what may be a small but painful point. You said uniforms. I gather you're not now saying uniforms. When I mention uniforms, Your Honor, I'm talking about the conversation that he had impersonated a police officer in the past, a Cook County police officer. He had done that in the past. But with respect to uniforms now, there's nothing in the record at the time they seek the ñ at the time they freeze the premises? Your Honor, there is information in the record, not that he had in the past possessed those Cook County uniforms, not necessarily U.S. marshals' uniforms in this particular instance. Okay. So what we have to support the probable cause determination, both for the warrant, which ended up being short-circuited, and for the freeze, which they did happen, we have the following, and supplement this for me if I'm giving you an incomplete list. They have testimony that he's impersonated the deputy U.S. marshal. We have the location of the badge and the credential that he used in doing that. We have reports of conversations he's had with co-employees about his impersonation of U.S. marshal. And we have testimony about the procuring of weapons. At the time of freezing, they did not know he was a felon, or did they? They did know that he had had a prior felony conviction for impersonating a police officer in Cook County. And did they know that at the time they did the freezing? At the time they applied for the search warrant and the time they were ñ Yes, I believe they did, Your Honor. I think the record is clear that when they froze the premises, they knew that he had a prior felony conviction for impersonating. Oh, okay. Well, that's an important point, then, because that makes the possession of the firearms illegal. Correct, Your Honor. Okay. And ñ What exactly was said about firearms? What's in the record about firearms? We're going to go through what we did with uniforms, maybe. What exactly was said? What did they know about firearms when they went to the house? They knew he was a convicted felon, and they had general ñ they had conversations with co-employees that he had talked about possessing weapons. I mean, did he say ñ he said, I possess weapons, or did he say ñ He said he's a deputy U.S. marshal. In that capacity, he carries a weapon. He's saying in that capacity, I carry a weapon? Or are you inferring? In other words, I'm wondering what was said by whom, to whom, when. Well, there's a witness, Carolyn Doss, that's in the record, and that was who the interview was done with. She was the one that was the victim in this particular case. She was the one that first alerted police that he had talked to her, indicated he was a deputy U.S. marshal. Other employees had indicated that he had talked about being a deputy U.S. marshal, about possessing weapons, that he was issued a standard weapon that deputy U.S. marshals are issued. He said that. Correct, Your Honor. They said that. Now, I hate to drag this out. Could you point to me where this was said? And I realize these questions are taking some time, and if we run over, we run over. Thank you. One moment. Did you not anticipate this question? I did, Your Honor, and I apologize for... Well, if it's in the record, it's in the record. We're capable of going back over it ourselves. Thank you. The record is lengthy here. There's four deputy U.S. marshals, Deputy Hall, Deputy Gardner, Deputy Diliberti, that all testified in this particular case regarding the interviews that were done with the co-employees and the information that they learned at the Art Institute on that particular day, and I think the record is clear regarding that, Your Honor. I think there is a direct nexus between the information they learned there and the residents here, Your Honor, and I believe it was a proper premises freeze with that probable cause that established in the record. If he says that he had guns, is that enough to connect to search a house? That alone, Your Honor, I think that the totality of the circumstances here, with everything put together, gets to that level, Your Honor. I believe that gets us over the hump in this particular case. I mean, we've – I can remember records where you have expert testimony that, well, this man was a drug dealer and we had all this evidence that he was a drug dealer, and in my experience as an officer, I know that drug dealers invariably have weapons at their homes as a matter of protection from the people they're dealing with, and so on. Can we make that kind of an assumption generally in the population, or do we? When someone has a – and the badge is located somewhere within the record – someone has a badge, credentials, identification, identifying him as a U.S. marshal, that as part of his job he carries a weapon as a U.S. marshal. And does he say that he's carrying it as part of his job or is he simply misrepresenting that he's a marshal? Misrepresenting that he's a marshal and as a part of that job he carries a weapon. I want you to be very clear. Split your sentences, two sentences. Number one, he says, I am a U.S. marshal. Number two, he says or he does not say, as part of that job I carry a gun. I believe in the record, Your Honor, as part of that he's issued a standard weapon. I'm sorry. I'm asking, is there in the record what he said? I understand what part of the job is, but I'm trying to figure out what in the record is there that says that he says, as part of the job I carry a weapon. There's never an admittance on his part. It's interviews with co-employees, Your Honor. And co-employees who say what? That say that he had indicated to them that he carries a weapon as part of his job. I see. And I guess I'll look in the record for that. Thank you, Your Honor. And those are all my arguments. Thank you very much. Mr. Tate, you saved some time and he ran over a little bit. So say what you need to say. Thank you, Your Honor. The court, upon searching the record, will find that it is devoid of any reference to any witness testifying that Michael Lugi said, I carry a gun on behalf of the U.S. Marshals Service. The record is devoid of any reference to him saying that there's police uniforms or equipment at his house or any witness testifying to anybody else told him that. It's for the record devoid of his statements that he had uniforms, period, not at his house. The record is devoid of him saying there is no witness that testified at any hearing conducted on this matter that said so-and-so told me that Michael Lugi said he had police uniforms at his house. The record is devoid. He said at his house. Did they say he had them? At his job, in his car, anywhere. It's devoid, period. It's not there. And what was the reference on guns? There is no reference to guns. It is a general testimony by one of the marshals saying that, oh, by the way, some unknown employee told me that he looked on the Internet from time to time for guns. It's that vague. It was not enough there to issue a search warrant, not even that he bought a gun, not that he had it shipped to his job and said nothing about selling it. I'm reluctant to do the same thing to you, but do you have that specific testimony? You can save me some time. Let me show you, let me invite the Court's attention to the excerpt of record, page 36, lines 8 through 20, which is Senior Deputy Hall who led the investigation. Hall testified that no person interviewed in connection with their investigation, Lugi, had ever been inside his home, that no one interviewed had any information concerning the presence of any badge or police equipment inside Lugi's home. Okay. That's Hall's testimony right there. Now, in addition, I'd like to point out that, regarding whether or not law enforcement knew of his previous conviction in Illinois, at the evidentiary hearing the first mention of Lugi's previous conviction was made when Deputy Hall described his conversation, his very brief conversation with the U.S. Attorney's Office. There was, let's just be clear, there never was an application for a search warrant. There never was an affidavit, although that was represented to Ms. Lugi in obtaining her consent. Officer Hall did not call the U.S. Attorney's Office until after the Lugi residents had already been seized for some time. This is obvious because Officer Hall testified that he had only been on the phone with the U.S. Attorney's Office for a couple minutes when he was informed that Lugi's consent had been obtained. By the way, what did Deputy Hall testify to at the hearing? It's in the record. He testified he never ordered a premises freeze. He never ordered that. He told them to go there and obtain consent. And the way that consent was obtained was by using this premises freeze, saying you will not get in this house unless you consent. That is the Fourth Amendment violation. So anything that happened after that is tainted by that violation. So your reading of the record is that when Officer Hall learns that from the U.S. Attorney's Office that there's prior conviction, including the possession of police attire, that takes place after the freezing of the premises? From everything that we know. I mean, I don't want to speculate, so I can only go to the record. The first thing, the first time it's referenced in the record is when he's on the phone with the U.S. Attorney's Office, and that's at Exhibit Record 332, line 13. Mr. Tate, is that the test, or is it that the officers may properly tell the wife, we're freezing the premises, we're in the process of getting a warrant, if you want to short-circuit that process, which is going to take two to four hours, will you consent to a search? Can't we look at the totality of the evidence that would have supported the issuance of a search warrant and find that it was not coercive to properly claim, as the deputies were in the process of doing, that they were going to get a warrant, but that a judge would have to decide whether or not he would issue it? In all due respect, Your Honor, I have to disagree. Is that it is coercive? Yes. The case of Bumper v. North Carolina, Supreme Court case, is very clear. Anytime you improperly use the proposition that you can get a search warrant or that you can search anyway when none has been applied for, none has been gotten, it will vitiate any consent that's given. But didn't the district court find that she was properly told that the deputies were in the process of getting a warrant and that a judge would have to say yes or no? No. The fact is that they never said that. What was told to them was that this is a slam dunk. We're going to get it. We're going to search anyway. This is a slam dunk. And there's a witness, the witness that testified, Mr. Gilbert. That's a quote from him. He was told that this is a slam dunk. The warrant is on its way. You will not get in this house. You might as well let us search now. And meanwhile, we're not letting you in the house. We're not letting you in the house. But if that's true, as far as the deputies are concerned at that point, I'm still struggling with why, as a matter of Fourth Amendment consent law, she still can't give a knowing and voluntary consent in order to avoid having to wait four hours for the outcome of that. Because it's the point of having to wait for four hours that vitiates an involuntariness. You know, if this were the case, anyone arrested, all police would have to do is show up at the house and say, you know what, we're going to get a search warrant and you're not going in this house until we get it unless you allow us to consent first. She's got small children. It's clear that she didn't want to consent. She consented because she couldn't go in the house. The testimony in the record even is that she consented because she didn't want to have to wait the four hours for the supposed search warrant, which after the fact they discovered, by the way, it wasn't even applied for. There was no search warrant. There was no application process. They were apparently in process, though. I understand there was no formal application made. But the record seems to me that they were they would have gone forward further and made formal application. The record does not support that proposition either, Your Honor, because the only thing that's in the record, that's the only thing we have to go by, is that he's on a brief conversation, less than two minutes is his testimony with an assistant U.S. attorney. There is nothing in the record as to what they were talking about. But, counsel, we all know that's how you start the process of obtaining a search warrant. You know that. I know that. Well, I mean, but there's nothing, if we just, if we're working with the record, if we're just working with the record, there's nothing in the record about what they talked about. Common sense tells us that that's the purpose of the call. And the deputy testified that he was in the process of talking to the AUSA about getting a warrant. So what's wrong with the claim? In all due respect, Your Honor, common sense tells me that consent is involuntary when you're denied access to your home and told that you can't get in the home unless you consent. Common sense tells me that. I understand your argument. And I just want to conclude briefly, and I, on this instruction of the Real quick. Instruction of justice enhancement. It is not, even the vague assertions that were used as a basis for the court, it was the offensive conviction, which is felon in possession, and a person in possession of official badge. That's pretty well covered, I think, in both briefs. And since you're over, we've got that part up well in hand. Okay. Thank you very much. Thank you. The case of United States v. Lujai is now submitted. We've got two more cases that are next on the calendar, both of which have been submitted on the briefs. United States v. Mendoza-Maldonado is submitted on the brief. United States v. Murillo-Contreras is submitted on the briefs. The next and last case on the calendar for argument today is
judges: Canby, W. Fletcher, Tallman